



# MISS UNIVERSE L.P., LLLP
1370 AVENUE OF THE AMERICAS, 16ᵀᴴ FLOOR
New York, New York 10019

As of July 24, 2014

Diamonds International Corporation – D.I.C. a.s.
Siroka 15
110 00 Prague 1
Czech Republic
ATTN: CEO Lubos Riha

Re: Diamonds International Sponsorship Agreement/
MISS USA/MISS UNIVERSE/MISS TEEN USA

Dear Mr. Riha:

Following sets forth the agreement (the "Agreement") between Miss Universe L.P., LLLP ("Producer") and Diamonds International Corporation ("Sponsor") in connection with the 2014-2024 MISS UNIVERSE Pageants, the 2015-2024 MISS USA PAGEANTS and the 2015-2024 MISS TEEN USA Pageants (each referred to herein as a "Pageant or collectively the "Pageants") and the prime-time television special(s) currently entitled "MISS USA 2015-2024", "MISS UNIVERSE 2014-2024" and MISS TEEN USA 2015-2024 (each referred to herein as a "Program," or collectively as the "Programs") intended to be initially telecast in the United States on the NBC Television Network (the "Network") as set forth herein below. For the avoidance of doubt, Sponsor acknowledges that Producer currently has no licensing arrangement for the exhibition of a television or other audio-visual program in connection with the 2015-2024 MISS TEEN USA Pageants and, accordingly, no Integration (as that term is defined below) benefits with respect to those pageants are incorporated herein.

1. The Term

This Agreement shall become effective on the date first above written and shall expire on December 31, 2024, unless terminated earlier pursuant to the terms hereof or as otherwise agreed (the "Term").

2. Sponsorship Rights

Sponsor shall receive the following:

(a) Official Designation: During the Term, and subject to the terms and conditions of this Agreement, a non-exclusive, worldwide license to use, reproduce and display the Producer Marks (as

defined in paragraph 3 of the Standard Terms and Conditions attached hereto as Appendix "I") solely as necessary to refer to Sponsor as the "Official Crown Sponsor" of the Pageant(s) in advertising and promoting Sponsor's brand. Sponsor's official sponsorship designation, the Producer Marks and all other rights granted to Sponsor in this Agreement shall not be used in connection with any other products, goods or services aside from the Articles created pursuant to the terms of this Agreement, unless otherwise agreed upon with Producer. Sponsor is not granted any right or license under this Agreement to sell, or otherwise distribute for sale, any of the promotional or advertising materials, or items related thereto. All uses by Sponsor of Sponsor's official sponsorship designation and Producer Marks shall be in accordance with the terms and conditions of paragraph 3 of the Standard Terms and Conditions attached hereto and shall be subject to the prior written approval of Producer, which approval shall not be unreasonably withheld. Sponsor acknowledges and agrees that it has no right to use Sponsor's official sponsorship designation or any of the Producer Marks except as set forth herein.

(b)  The Integration: Sponsor's brand and/or Articles will be included within each applicable Program as it is initially aired on the Network as follows:

(i)  Sponsor will receive (A) at least one (1) promotional prize spot (which may be handled separately or intertwined within each such Program, at Producer's sole discretion) consisting of at least ten seconds (:10) of voice-over product identification accompanied by video and (B) one (1) audio mention identifying Sponsor as the crown provider in a segment of each such Program. Notwithstanding the foregoing, Producer has no obligation to include Sponsor in the 2014 MISS UNIVERSE Program but will make commercially reasonable efforts to do so.

(ii)  The inclusion of Sponsor's brand and/or Articles (as applicable) within each such Program as described in this subparagraph (b) shall be referred to herein as the "Integration." Without limiting the foregoing, Sponsor hereby acknowledges and agrees that Producer and NBC Entertainment, a division of NBC West, LLC ("NBC") shall have creative approval and control with respect to the Integration. Sponsor shall identify and provide Producer access to Sponsor's personnel and resources in connection with the creation of the Integration, as may be reasonably required by Producer and at no cost to Producer.

(c)  Event Tickets: A minimum of Six (6) VIP tickets to the Presentation Show, Dress Rehearsal, Finals telecast, and Coronation Ball (or equivalent event), if any, for each of the Pageants. Producer will make best efforts to provide additional tickets for each Pageant at Sponsor's request or to provide an opportunity for Sponsor to purchase additional seats for each Pageant.

(d)  Program Book Advertisement(s): One (1) full-page color advertisement in the souvenir program book for each of the Pageants. In this regard, Sponsor shall supply, at its sole expense, Sponsor's advertisement(s) formatted on disc or color separations and progressive proofs of the same in accordance with instructions to be provided by Producer concerning advertisement specifications, delivery address and delivery deadline for receipt for each such Pageant. Sponsor shall forward a sample of Sponsor's advertisement(s) to Producer's Marketing Department for Producer's prior written approval, which approval shall not be unreasonably withheld.

(e)  Pageant Web Site Listing(s): A listing (including a logo placement) for Sponsor on the "Official Sponsors" section of Producer's Web site for each applicable Pageant, which listing(s) shall commence on a date to be determined by Producer in its sole discretion (but in no event shall the listing commence later than thirty [30] days prior to the Finals show date of the applicable year's pageant) and shall remain on the sponsor section of the applicable Web site through at least the end of the Term (the exact date(s) to be determined by Producer in its sole discretion). Each such listing is subject to the prior written approval of Producer, which approval shall not be unreasonably withheld.

(f) Pageant Web Site Link(s): Producer shall place a link from Producer's "Official Sponsors" section of its Web site for each applicable Pageant to the homepage of Sponsor's website. Sponsor will provide Producer with technical specifications, text and graphical artwork to use in creating the linked pages. The duration of the link(s) between Producer's website(s) and Sponsor's website shall commence on dates to be designated by Producer in its sole discretion (but in no event shall the link commence later than thirty [30] days prior to the Finals show date of the applicable year's pageant) and shall continue through and including at least the end of the Term, the exact date(s) to be determined by Producer in its sole discretion. Neither party shall use the other party's name, trademarks and/or service marks in any meta data on their respective websites. Each party shall be solely responsible for the development, operation, and maintenance of its website(s) and for all materials that appear therein.

(g) Signage: Subject to the approval of the host organization for each applicable Pageant, the owner of each applicable Pageant venue and the official host hotel for each applicable Pageant, the right to display a co-branded (i.e., with a Sponsor and the applicable Pageant reference) banner at the venue during the Preliminary show and the Finals show for each of the Pageants and at the official host hotel for each such Pageant during the applicable Pageant production period, provided that: (i) the banner(s) shall be provided by Sponsor (at its sole expense) and shall be of a size and design approved by Producer; (ii) the banner(s) shall be furnished when and where required by Producer; and (iii) the placement of the banner(s) shall be at the sole discretion of Producer and each such Pageant host organization, venue owner and/or host hotel, as applicable.

(h) On-Site Promotional Event(s): The right to host a promotional event related to Sponsor's brand in the host city of each of the Pageants during each such Pageant's production period, at which events Producer will arrange for the appearance of the reigning titleholder (i.e., the titleholder from the prior year's pageant), subject to the reigning titleholder's availability. In the event the reigning titleholder is unavailable, Producer will arrange for the appearance of a group of Pageant contestants (the number of participating contestants to be determined by Producer in its sole discretion). Such event(s) may include, by way of example, a "meet and greet" at a retail store that sells Sponsor's products or a meeting with the trade and/or Sponsor's employees. Sponsor must notify Producer of its desire to hold such a promotional event at least sixty (60) days prior to the date of the contestants' arrival on location at the applicable Pageant site. Sponsor's failure to notify Producer in a timely manner will result in Sponsor's waiver of such right to conduct a promotional event with the reigning titleholder or contestants in the applicable Pageant. Each such proposed event shall be subject to the approval of Producer, which approval will not be unreasonably withheld. Each such event shall take place at a time and place compatible with the production schedule for Producer staff and the reigning titleholder and/or contestants and which is mutually convenient to Producer and Sponsor, and shall be no longer than two (2) hours in duration, exclusive of reasonable local travel time. Sponsor is responsible for the implementation, and management of the event(s) and for all costs and expenses associated with the event(s), including, without limitation, ground transportation for all participants, security (as deemed necessary by Producer in its sole discretion), advertising and promotion.

(i) Email Blast: At its sole discretion and subject to its legal obligations, Producer shall send at least one (1) email blast during the Term to its opt-in database of subscribers promoting Sponsor.

(j) Product Samples: The right to provide assorted Sponsor products for inclusion in gift bags provided to contestants and talent (including judges and hosts) for each of the Pageants. If Sponsor wishes to provide such products, any such products shall be shipped by Sponsor, at Sponsor's

sole cost and expense, to Producer in accordance with delivery instructions to be furnished by Producer.

(k) <u>Promotional Sweepstakes</u>: The right to implement and operate a promotion during the Term involving a sweepstakes or contest in connection with Sponsor's brand and each of the Pageants, pursuant to which prize winner(s) shall receive a prize such as, by way of example, a trip for two (2) to attend the Finals telecast of each such Pageant (each a "Sweepstakes" and collectively, the "Sweepstakes'"). The applicable Sweepstakes can be offered to the general public, special customers or as incentives to retailers. Sponsor shall draft the applicable Sweepstakes rules subject to Producer's approval. Neither Producer's approval of nor failure to exercise its right to review the official rules for any Sweepstakes shall constitute an opinion as to the legal appropriateness or adequacy of such rules or their manner of use. Sponsor shall be solely responsible for compliance with all aspects of federal, state and local laws and regulations applicable to the conduct of any Sweepstakes. Neither Sponsor nor Producer shall allow any information collected in connection with any Sweepstakes to be used in any manner that is not consistent with existing law, including but not limited to the Children's Online Privacy Protection Act. Sponsor shall be solely responsible for all aspects (including all costs and expenses) of any Sweepstakes, including, without limitation, designing each such Sweepstakes offer (including, without limitation, the selection of prizes), supplying any and all materials required by the applicable Sweepstakes rules (including, without limitation, consumer displays) and operating any such Sweepstakes (including, without limitation, selection of winners and prize fulfillment). The designation of prizes and any and all materials to be utilized in connection with any such Sweepstakes shall be subject to Producer's prior written approval, which approval shall not be unreasonably withheld.

(l) <u>Titleholder Personal Appearance(s)</u>: Subject to the execution by Sponsor of Producer's then in-effect standard titleholder personal appearance agreement, the services of the winner of each applicable Pageant (each a "Titleholder" and collectively, the "Titleholders") for at least one (1) personal appearance (each applicable personal appearance to consist of one [1] appearance day and up to two [2] travel days) at a Sponsor store opening, intra-company sales meeting, dinner, reception or similar event at locations to be approved by Producer and Producer's Director of Security. Each such personal appearance shall be subject to the availability of the applicable Titleholder and scheduling considerations, including prior professional and personal commitments, and shall take place prior to December 31 of the calendar year in which each such Titleholder wins her title (e.g., the personal appearance for the Miss USA 2015 titleholder must take place prior to December 31, 2015 and the personal appearance for the Miss Universe 2015 titleholder must take place prior to December 31, 2015). Sponsor acknowledges that it will be responsible for all costs associated with each such appearance, including, without limitation, security, translators, business-class air transportation, first-class ground transportation and first-class hotel accommodations for the applicable Titleholder and her travel companion(s) for such appearance (one [1] travel companion for any Titleholder appearance at a location in the United States [excluding its territories, commonwealths, and possessions] and two [2] travel companions for any Titleholder appearance at a location outside the United States [which shall include an appearance in any United States territory, commonwealth, and possession]), meals or a reasonable per diem, travel manager fees, translator fees, security director fees, and the like. At the discretion of Producer, Sponsor, in their capacity as Official Crown Sponsor, can appear at the Titleholder's scheduled appearances to promote Sponsor's brand.

(m) <u>Web Site Video</u>: Producer shall create one (1) promotional web video (such video not to exceed ninety (90) seconds unless mutually agreed to otherwise) for each Pageant to be featured on the Producer and Sponsor websites to promote and continue raising awareness for Sponsor. Subject to Producer approval, Sponsor shall have the right to use the video in Sponsor's retail stores during the Term. The content of the video shall be at the Producer's discretion in consultation with Sponsor.

(n) <u>Launch Event</u>: Sponsor shall have the right to host a launch event related to the new Crown/Sponsorship relationship. Any such Launch Event shall be the sole responsibility of Sponsor at its cost, and subject to the terms set forth in Section 2(l) above (i.e., titleholder availability, security, etc.).

(o) <u>Sponsor Photographs</u>: Sponsor shall be permitted to utilize up to five (5) images of contestants or Titleholders of the Pageants that are supplied by Producer to Sponsor at Sponsor's request (the "Photos") during each year of the Term. Sponsor shall have the license to use the pre-approved Photos to promote their status as the official sponsor of the Pageant during the Term. Such uses may include, but are not limited to: catalogs, company calendar, point-of-purchase promotions and web promotions. For the avoidance of doubt, the Photos may only be used to promote the Sponsor in connection with the Pageant and the Articles (crowns and tiaras as defined herein) which are the subject of this Agreement and may not be sold for commercial purposes or incorporated into any merchandise. The Photos may not be used without the prior written consent of Producer, which consent Producer may grant or withhold in its sole discretion. Further, Sponsor will not use the Photos in any way that will disparage or embarrass Producer or the Pageant contestants. Producer shall have the right to review and approve all proposed use of the Photos by Sponsor, including but not limited to any and all copy Sponsor intends to use in connection with the Photos. Sponsor agrees that it will not use any Photos or copy that is at any time rejected for use by Producer. All materials submitted for Producer's approval shall be forwarded to Producer's Marketing Department (Attention: Shawn McClain). Sponsor must obtain, at its own expense, all required third party clearances and releases necessary for Sponsor's use of the Photos, including, without limitation, consents from third parties who appear recognizably in the Photos. Sponsor shall immediately cease all use of the Photos upon expiration or termination of this Agreement. Photos or videos taken by Sponsor or its agents are subject to the same restrictions in this Agreement and may not be used absent consent by Producer.

(p) <u>National Directors</u>: Producer will present Sponsor as the "Crown Sponsor" of Producer to the companies and individuals around the world who are licensed to organize and produce the pageants ("National Pageants") that select the contestant to represent each country in the international MISS UNIVERSE Pageant ("National Director"). After such introduction is made by Producer, Sponsor will engage in its own negotiation with the National Director to determine the feasibility, form and conditions of any potential agreement with respect to a particular National Pageant, if any.

(q) <u>Sales Team</u>: In the event that any National Director, National Pageant contestant or titleholder or other party related to the National Pageant, not already engaged by Sponsor at the date of execution of this Agreement, including any sub-agents of the above, is engaged as an agent by DIC to promote and sell Sponsor's products (each a "Sales Agent"), Producer will get an adequate remuneration. The amount of such remuneration to be agreed upon in writing by the parties in a separate agreement which will govern the payment of commissions regarding Sales Agents' sales and the Parties' obligations with respect thereto. Within two (2) weeks of the signing of this Agreement, Sponsor shall provide Producer with a list of individuals who would otherwise be considered Sales Agents under this Agreement but who will be excluded as a result of having a pre-existing relationship with Sponsor. The parties agree and acknowledge that Producer shall not be obligated to make any introductions contemplated in paragraph (p) of this Agreement unless and until Producer and Sponsor have executed a written sales agreement which governs the parties' obligations and commissions due to Producer. Sponsor agrees that it shall not knowingly approach or discuss the potential for any agreement with a Sales Agent prior to the parties' good faith negotiation of the separate written sales agreement referenced in this paragraph. This Section shall survive termination or expiration of the Agreement as well as the termination or expiration of any agreement between Producer and any

National Director. For the avoidance of doubt, Sponsor acknowledges and agrees that Producer cannot and does not guarantee that Sponsor will secure any agreements with any National Director or Sales Agent.

All of the benefits and rights provided to Sponsor as described in this paragraph 2 shall be referred to herein as the "Sponsorship Rights." Producer expressly reserves any and all rights concerning the Pageant(s), the Program(s), the Titleholder(s), the Producer Marks and any other intellectual property not specifically granted to Sponsor in this Agreement, including, without limitation, the right to pursue licensing, promotional and endorsement arrangements concerning the Pageant(s), the Program(s), the Titleholder(s), the Producer Marks and/or any other intellectual property owned by Producer, for the sale, distribution or exploitation of any products, services or other merchandise in any and all product categories, and use of the Titleholder(s) for personal appearances, promotional and advertising campaigns or as a model in any and all product categories.

3. Consideration

In consideration of the Sponsorship Rights set forth in paragraph 2 above, the parties hereby agree as follows:

(a) Cash Fee: Sponsor will pay to Producer a fee in the amount of Two Million Two Hundred and Eighty Thousand U.S. Dollars (US$2,280,000) (the "Cash Fee") in exchange for the Sponsorship Rights, which shall be allocated and payable as follows:

- (i) The fee for the 2015 Pageants is One Hundred Forty Thousand Dollars ($140,000) payable as follows: Twenty Five Thousand Dollars ($25,000) upon execution of this Agreement; Fifty-Seven Thousand Five Hundred Dollars ($57,500) on or before January 1, 2015; and Fifty-Seven Thousand Five Hundred Dollars ($57,500) on or before March 31, 2015.

- (ii) The fee for the 2016 Pageants is One Hundred Ninety Thousand Dollars ($190,000) payable as follows: Ninety-Five Thousand Dollars ($95,000) on or before January 1, 2016 and Ninety-Five Thousand Dollars ($95,000) on or before March 31, 2016 ;

- (iii) The fee for the 2017 Pageants is One Hundred Ninety Thousand Dollars ($190,000) ) payable as follows: Ninety-Five Thousand Dollars ($95,000) on or before January 1, 2017 and Ninety-Five Thousand Dollars ($95,000) on or before March 31, 2017;

- (iv) The fee for the 2018 Pageants is Two Hundred Fifteen Thousand Dollars ($215,000) payable as follows: One Hundred Seven Thousand Five Hundred Dollars ($107,500) on or before January 1, 2018 and One Hundred Seven Thousand Five Hundred Dollars ($107,500) on or before March 31, 2018;

- (v) The fee for the 2019 Pageants is Two Hundred Fifteen Thousand Dollars ($215,000) payable as follows: One Hundred Seven Thousand Five Hundred Dollars ($107,500) on or before January 1, 2019 and One Hundred Seven Thousand Five Hundred Dollars ($107,500) on or before March 31, 2019;

- (vi) The fee for the 2020 Pageants is Two Hundred Forty Thousand Dollars ($240,000) payable as follows: One Hundred Twenty Thousand Dollars

($120,000) on or before January 1, 2020 and One Hundred Twenty Thousand Dollars ($120,000) on or before March 31, 2020;

(vii) The fee for the 2021 Pageants is Two Hundred Forty Thousand Dollars ($240,000) payable as follows: One Hundred Twenty Thousand Dollars ($120,000) on or before January 1, 2021 and One Hundred Twenty Thousand Dollars ($120,000) on or before March 31, 2021;

(viii) The fee for the 2022 Pageants is Two Hundred Seventy-Five Thousand Dollars ($275,000) payable as follows: One Hundred Thirty-Seven Thousand Five Hundred Dollars ($137,500) on or before January 1, 2022 and One Hundred Thirty-Seven Thousand Five Hundred Dollars ($137,500) on or before March 31, 2022;

(ix) The fee for the 2023 Pageants is Two Hundred Seventy-Five Thousand Dollars ($275,000) payable as follows: One Hundred Thirty-Seven Thousand Five Hundred Dollars ($137,500) on or before January 1, 2023 and One Hundred Thirty-Seven Thousand Five Hundred Dollars ($137,500) on or before March 31, 2023; and

(x) The fee for the 2024 Pageants is Three Hundred Thousand Dollars ($300,000) payable as follows: One Hundred Fifty Thousand Dollars ($150,000) on or before January 1, 2024 and One Hundred Fifty Thousand Dollars ($150,000) on or before March 31, 2024.

All payments referenced in this paragraph shall be sent by wire transfer to Miss Universe L.P., LLLP c/o JPMorganChase Bank, ABA Routing Number 021-000021, Account No: 230-289762.

Notwithstanding anything herein the contrary, Sponsor recognizes that Producer shall retain all artistic and creative control with respect to the Program(s) and may decide for subjective reasons or otherwise to produce and/or edit the Program(s) in such a way that the Integration may not appear as set forth in Paragraph 2 above. In such case, Sponsor agrees that its sole remedy shall be as follows: In the event that no portion or only a portion of the Integration is included in the initial broadcast of any Program taken on the Network as set forth in paragraph 2 above, the Cash Fee shall be reduced on a pro-rata basis to be negotiated in good faith between the parties.

(b) Products and/or Services: Sponsor will provide to Producer the following products and/or services in connection with the Pageant(s), Program(s) and/or the Integration:

(i) Crowns/Tiaras. Sponsor shall design, manufacture and furnish to Producer, at no cost or expense to Producer:

1. Three (3) crowns created from precious metals, diamonds and precious stones each ranging in value from Two Hundred Thousand Dollars to Three Hundred Thousand Dollars ($200,000-$300,000)(collectively and individually referred to as the "Crowns") and three (3) replica crowns manufactured from non-precious metals and stones (identical in appearance, fit, style and structure) produced on the same time schedule as the Crowns; and

2. One (1) tiara for the winner of each Pageant beginning with MISS UNIVERSE 2014. In the event that the MISS USA Titleholder becomes MISS UNIVERSE Titleholder during the term of this Agreement, Sponsor shall furnish the new MISS USA Titleholder (who had been the runner up) with a MISS USA tiara.

The crowns and tiaras shall each be referred to as an "Article" and collectively be referred to as the "Articles". At Sponsor's request and subject to Producer's scheduled need for use of the Crowns, Producer shall use best efforts to allow Sponsor to display the original, genuine Crowns at Sponsor's store locations or the like, provided that all costs associated with shipping, storing and maintaining of the Crowns, including insurance and security to travel with the Crowns, shall be the sole responsibility of Sponsor. Sponsor shall also return the Crowns to Producer upon Producer's request, on no more than Five (5) days' notice.

(ii) Creation and Approval Sponsor shall submit to Producer and Producer shall have absolute approval over all sketches, models and designs and materials used in the creation of the Articles, and all artwork related to the promotion of the Parties' sponsorship relationship and the Articles (regardless of whether any of the materials incorporated therein were provided by Producer for Sponsor's use, or artwork created by Sponsor and/or its designees), all Articles and all Collateral Materials at all stages of development and production. Sponsor may not manufacture, use, offer for sale, sell, advertise, ship or distribute any Articles or Collateral Materials without Producer's prior written approval. "Collateral Materials" is defined as all artwork, packaging, labels, press releases, copy, literary text, advertising material, promotion material and all other materials of any sort utilizing the Producer Marks and/or related to the Articles.

(iii) No later than August 15, 2014, Sponsor shall, at its own cost, submit to Producer for approval at least Five [5] original and unique drawings or sketches of each Article for Producer's review (the "Designs"). Sponsor shall under no circumstances provide Producer with any Designs which include the copyrighted or trademarked work of any third party. Producer shall thereafter submit its design choices, including any requests for customization or additional Designs, within fourteen (14) days. Once any such customization or new or additional Designs are received by Producer, Producer shall thereafter have an additional fourteen (14) days to submit its design choices, including any requests for customization or additional Designs.

(iv) Within thirty (30) days of final approval by Producer of the Designs for each Article, Sponsor shall provide Producer: (a) one (1) prototype of each Article ("Prototype") and; (b) one (1) drawing, storyboard or rough cut of each Article (collectively "Preliminary Artwork"); and (c) one (1) pre-production sample (final samples of each Article before entering production) ("Pre-Production Sample"), as applicable. All such Prototypes and/or Preliminary Artwork shall be sent to: Miss Universe L.P., LLLP, 1370 Avenue of the Americas, New York, NY 10019, Attn.: Shawn McClain.

(v) Producer shall use its best efforts to provide acceptance or approval of Prototypes and Preliminary Artwork within fourteen (14) business days of receipt from Sponsor. Any submission of a Prototype, Pre-Production Sample and/or Preliminary Artwork which is not approved in writing by Producer shall be deemed disapproved. Any changes required by Producer to any such Prototypes, Pre-Production Sample and/or Preliminary Artwork which have been disapproved by Producer, shall be made by Sponsor.

(vi) Upon approval of Prototype and Artwork by Producer, Sponsor shall submit final samples of all Articles to Producer for final approval. Producer shall use its best efforts to provide acceptance or approval of samples within fourteen (14) business days of receipt from Sponsor. With respect to all such samples which have received Producer's final approval, Sponsor shall not depart therefrom in any material respect, without Producer's prior written approval. All sketches, Designs, Preliminary Artwork, Prototypes, Pre-production Samples and Collateral Materials not approved by Producer shall be destroyed or shall have any Producer Marks or other Producer Intellectual Property removed. Such destruction shall be attested to in a certificate signed by one of Sponsor's officers. Producer's approval of Articles, and Collateral Materials shall in no way constitute or be construed as an approval by Producer of Sponsor's use of any trademark, copyright and/or other proprietary materials not original to Sponsor or owned by Producer. No approval by Producer under this Paragraph shall constitute a waiver or modification of Sponsor's obligations under any other provision of this Agreement.

(vii) Sponsor represents and warrants that the Articles are and shall be safe and suitable for their intended purpose and do not and will not contain any injurious, poisonous, toxic or harmful substances, and that are not and will not be inherently dangerous to users thereof. Sponsor represents and warrants that it will at all times comply with all government laws and regulations, including, but not limited to consumer products safety, safety, food, health, drug, cosmetic, sanitary, employment standards, wages and benefits, and employee health and safety or other similar laws, and all voluntary industry standards relating or pertaining to the manufacture, sale, advertising or use of the Articles, and shall maintain its appropriate customary high quality standards during the Term hereof. Sponsor shall comply with any regulatory agencies which shall have jurisdiction over the Articles and shall procure and maintain in force any and all permissions, certifications and/or other authorizations from governmental and/or other official authorities that may be required in response thereto. Each Article and component thereof distributed hereunder shall comply with all applicable laws, regulations and voluntary industry standards. Sponsor shall follow reasonable and proper procedures for testing, certification and labeling that all Articles comply with such laws, regulations and standards. Sponsor shall permit Producer or its designees, within five (5) days prior notice, to inspect testing records and procedures with respect to the Articles for compliance. In the event that the quality standards herein above referred to are not met, Sponsor shall, upon written notice from Producer, replace such Articles with conforming goods, unless Sponsor shall have remedied such failure of quality to Producer's satisfaction within ten (10) days after Sponsor's receipt of notice thereof; failure to effect such remedial measures shall entitle Producer to terminate this Agreement upon notice to Sponsor. Further, Sponsor agrees that it shall not, directly or indirectly, (i) use child labor, forced labor, or prison labor for the manufacture or assembly of the Articles or any components thereof, (ii) employ physical disciplinary practices on employees, or (iii) use gifts or favors to influence government officials or customs agents.

(viii) Each Article shall be furnished with appropriate tags, labels, packaging, packing inserts, wrapping and labeling ("Packaging"). In addition, such Packaging shall include, at no cost or expense to Producer, protective travel cases for the Articles.

(ix) Sponsor agrees, as an essential condition hereof, that it will cause to appear in the appropriate place on or within each Article manufactured by it under this Agreement and on or within all Packaging, all appropriate copyright, trademark or other legal notices as desired by Producer and, where such Articles or Packaging bears the name of Producer as a trademark or service mark, an appropriate trademark or service mark ownership notice as desired by Producer. All crowns and tiaras furnished to Producer by Sponsor under this Agreement shall include in an appropriate location (approved by Producer) on each crown and tiara the following legend "© and TM [Year] Miss Universe L.P., LLLP" or such other legend as shall be approved by Producer. Without limiting the

foregoing, the copyright notice specified by Producer must be permanently affixed in a reasonably prominent position in the order and manner specified by Producer on each Article and on all Packaging and when a Producer Mark is used on or in connection with the Articles and/or for Packaging, Sponsor shall: (i) abide by the trademark laws and what are considered to be sound practices in regard to trademark notice provisions in the applicable territory; (ii) properly use the "™" or "®" designation and other trademark notice and information, as instructed by Producer; and (iii) not use the Producer Marks as the generic name of the Articles and/or Packaging. Each and every tag, label, imprint, or other device containing any such notice and all material bearing the name of Producer shall be submitted by Sponsor to Producer for Producer's written approval prior to use by Sponsor. In the event there has been no previous registration of a claim to copyright in, or of trademark or service mark rights in the Articles in the form in which it appears on, or in relation to the Articles and/or any material relating thereto, Sponsor shall, at Producer's expense, but only at Producer's request, file and prosecute one or more applications for copyright, trademark and/or service mark registration in the appropriate office(s) or class(es) in the name of Producer, or if Producer so requests in writing, in any other name designated by Producer.

(x) The Articles (with Packaging) shall be shipped, at Sponsor's sole expense, to Producer in accordance with specific instructions regarding arrival dates and locations for delivery, which shall be furnished by Producer in advance of the Pageant. Sponsor shall provide Producer's Marketing Manager with contact information to enable him to coordinate shipment and delivery of the Articles to the designated location(s). Sponsor shall be responsible for providing appropriate insurance and security, at Sponsor's sole expense, for the Articles while they are in transit during delivery to Producer. Title to each Article shall not pass from Sponsor to Producer until such Article is in the possession, custody and control of Producer. Sponsor acknowledges that "time is of the essence" with respect to the delivery of the Articles. In the event any Article is not delivered in a timely fashion, Sponsor shall be liable to Producer for any additional production costs or expenses incurred by Producer resulting from Sponsor's delay in delivering such Article. At Sponsor's request, subject to Producer's sole discretion, Sponsor may showcase the Crowns which are the subject of this Agreement at locations of its choosing. In the event Sponsor makes such a request, Sponsor shall be solely responsible for all costs related thereto, including shipping and insurance, and shall be responsible for returning the Crowns to Producer when requested, also at Sponsors sole cost.

(xi) Maintenance. Sponsor agrees that during the Term of this Agreement it shall make any and all necessary repairs or maintenance to the Articles, at no cost to Producer, on a timely basis. Sponsor also agrees that it shall replace any Articles that are lost or stolen while in Sponsor's custody and control at no cost to Producer on a timely basis.

(xii) Titleholder Gift. Sponsor shall award to each Titleholder, at no cost or expense to Producer, an assortment of Sponsor products, with a retail value of Five Thousand U.S. Dollars ($5,000 U.S.), as a gift from Sponsor (the "Gift"). The Gift will be shipped, at Sponsor's sole cost and expense, to Producer's Marketing Department in accordance with deadline and delivery instructions to be furnished by Producer.

(c) Locations: If necessary, Sponsor grants to Producer the right to use Sponsor's place of business and all locations to which Sponsor transports any members of the cast or crew of the Program(s) as locations for photographing, filming and taping the Program(s) (collectively referred to herein as, the "Locations"). Sponsor agrees that Producer may place all necessary facilities and equipment at or on the Locations, and Producer agrees to remove them after completion of work and leave the Locations in as good condition as supplied to Producer, except for reasonable wear and tear from the uses permitted. Sponsor further agrees that Producer may include any and all furnishings, works of art and other items located in and around the Locations in any and all photographs, film and

video and sound recordings made or taken by Producer hereunder, and that such inclusion by Producer will not violate the rights of any third parties. Signs at or on the Locations may, but need not be, removed or changed by Producer, provided that if removed or changed, Producer will restore them to their original location or replace them (whichever is applicable). Producer may, if it elects, include any and all signs at or on the Locations and any trade names, trademarks and logos belonging to Sponsor in the photographs, film and video and sound recordings, and any other materials made or taken by, or on behalf of, Producer pursuant to this Agreement, but Producer shall have no obligation to do so. Sponsor agrees that it shall obtain any and all third party permissions necessary to fulfill its obligations under this subparagraph (c).

4. Grant of Rights. Sponsor acknowledges and agrees that all rights of any kind or nature now or hereafter known in and to and derived from or ancillary to the Articles, Packaging and/or all the results, proceeds and products of Sponsor's services in the creation of the Articles and Packaging (including, without limitation, designs, ideas, concepts, plans, creations or work product produced during the term of this Agreement, including, without limitation, any sketches, drawings, models, sculptures and samples and designs of the Articles and any physical materials created by Sponsor and under the authority of Sponsor in whatever stage of completion) (collectively, the "Material"), which are incorporated in the final manufactured Articles, will be Producer's sole and exclusive property, free and clear of all encumbrances, claims, liens, demands, claims for royalties or residuals or any other interests of any kind. Sponsor acknowledges and agrees that the Material and any portion thereof shall constitute a "work-made-for-hire" (within the meaning of U.S. and international copyright laws) for Producer and Producer shall be considered the sole author of the Material and any portion thereof for all purposes and the sole owner, throughout the world and in perpetuity, of all rights, title and interest of every kind and nature in the Material and any portion thereof (including, without limitation, all copyrights and trademarks and any extensions or renewals therein). In the event the Material or any portion thereof are not deemed to constitute a "work-made-for-hire," Sponsor hereby irrevocably assigns, transfers and conveys to Producer, without reservation, all of Sponsor's right, title and interest of every kind and nature in and to the Material throughout the universe in perpetuity (including, without limitation, all copyrights and trademarks and any extensions or renewals therein). Producer, its representatives, designees, licensees, agents, successors, and assigns shall have the sole and exclusive right, but not the obligation, to use and exploit the Material (including, without limitation, the Articles and Packaging), in whole or in part, in any manner and in any and all media, whether now known or hereafter devised, throughout the universe and in perpetuity. Producer, its representatives, designees, licensees, agents, successors, and assigns shall have the sole and exclusive right, but not the obligation, to use, refrain from using, adapt, change, alter, modify or revise the Material (including, without limitation, the Articles and Packaging), in whole or in part, and to combine the same, in whole or in part, with other material or works, and Sponsor acknowledges and agrees that Sponsor has no right of approval or consultation in this regard. Producer shall own any so called "rental and lending rights" or similar rights. Sponsor waives hereby waives any so-called "moral rights" and similar rights of authors or creators throughout the world with respect to the Materials and agrees never to contest the exclusive, complete and unrestricted ownership by Producer in and to the Materials. Sponsor will sign, upon request, any documents needed to confirm that the Material or any portions thereof (that are embodied in the final Articles) are a Work Made for Hire and to effectuate the assignment of its rights to Producer. All rights granted or agreed to be granted to Producer under this paragraph 4 shall vest in Producer immediately without reservation, condition or limitation and shall survive the termination or expiration of Agreement for any reason. Sponsor warrants and represents that the Materials are Sponsor's sole creation, are unique and original and clear of any encumbrances, and nothing contained therein infringes or violates the rights of any third party. Sponsor will not challenge or contest, assist in any challenge or contest to, the validity of Producer's exclusive ownership in all rights and interests in and to the Materials.

5. Credit

(a) Provided that the Integration is included in each applicable Program as it is initially aired on the Network pursuant to paragraph 1 above, then subject to Sponsor not being in default of any of its representations, warranties and/or obligations hereunder, Sponsor will receive a screen credit in substantially the following form in the end credits of each Program as it is initially aired on the Network: "Promotional consideration furnished by Diamonds International Corporation." Except as otherwise expressly provided in this paragraph 5, all other aspects of Sponsor's screen credit will be at the sole discretion of Producer and the Network.

(b) No casual or inadvertent failure by Producer, the Network or others to comply with the provisions of this paragraph 5 shall be deemed a breach of this Agreement, nor shall failure by any third party to accord any credit to Sponsor hereunder constitute a breach by Producer, NBC and/or the Network of this Agreement. In the event of a breach of this paragraph 5, the sole right and remedy of Sponsor shall be the right, if any, to seek damages in an action at law and shall not include the right to seek injunctive or other emergency or equitable relief, or to rescind this Agreement or any of the rights granted or to be granted to Producer, NBC and/or the Network hereunder. The Network and/or Producer (as applicable) shall take such steps as are reasonably practicable to prospectively cure any failure to accord any required credit, to the extent such cure is not unduly expensive. All of the provisions of this paragraph 5 shall be subject to the then-current credit policies of the Network.

6. Non-Compete

Sponsor will not during the Term of this Agreement sponsor or affiliate in any way, directly or indirectly, with any other beauty or model pageant, beauty or model contest or beauty or model search (other than a pageant, contest or search produced by Producer or by an authorized licensee of Producer, such as a National Director, with notice to Producer).

7. Ownership of the Pageant(s)/Program(s)

No rights are granted to Sponsor to use the Pageant(s) and the Program(s) or any elements thereof. Without limiting the foregoing, Sponsor acknowledges that this Agreement does not grant Sponsor the right to use the names or likenesses of any persons who have rendered or are rendering services in connection with the Pageant(s) and the Program(s).

8. Broadcast of Pageants

Producer and Sponsor agree that in the event the Finals show of any MISS USA or MISS UNIVERSE Pageant covered under this Agreement is not televised (live or taped) by free, cable or subscription television, Producer shall not be deemed to be in breach of this Agreement. Producer and Sponsor further agree that in the event the Finals show of any MISS USA or MISS UNIVERSE Pageant covered under this Agreement is not broadcast in the manner set forth in the preceding sentence, Producer shall refund a portion of the Cash Fee for such Pageant, agreed upon in good faith by Producer and Sponsor, if any, to Sponsor. The refund of the applicable Cash Fee(s), if any, will be the full obligation of Producer to Sponsor and the sole recourse of Sponsor against Universe.

9. Standard Terms and Conditions

This Agreement is subject to the Standard Terms and Conditions attached hereto as Appendix I and incorporated herein by reference.

10. Entire Agreement

This Agreement, including the Standard Terms and Conditions attached hereto, collectively constitutes the entire agreement between Producer and Sponsor with respect to the subject matter hereof, all previous understandings whether oral or written having been merged herein, and no portion of this Agreement is subject to further negotiation, unless expressly stated herein. No representations or warranties have been made other than those expressly set forth herein. This Agreement may not be changed, modified, renewed, extended, or discharged or any covenant or provision hereof waived except by an agreement in writing signed by the party against whom enforcement of the change, modification, renewal, extension, discharge or waiver is sought.

This Agreement will not be binding on Producer unless and until it has been accepted and signed by an authorized officer of Producer.

Please confirm your acceptance of the foregoing by signing below where indicated.

Sincerely,

MISS UNIVERSE L.P., LLLP

By: _____
Paula M. Shugart, President

**AGREED AND ACCEPTED:**

DIAMONDS INTERNATIONAL CORPORATION

By: _____
(signature)

_LUBOS RIZA_
(print name)

Title: _CHAIRMAN of The BOARD_

Date: _24. 7. 2014_

**Appendix "I"**

**Standard Terms and Conditions**

1. NO LIMITATION; NO OBLIGATION TO EXHIBIT Nothing herein shall be construed as limiting Producer's right to exhibit, distribute and otherwise exploit any Program in any manner. Furthermore, nothing herein shall be construed as limiting Producer's and NBC's right, which shall be exercisable in Producer's and NBC's sole discretion (as applicable), to exhibit and/or otherwise exploit any Program and any edited versions of any Program (including, without limitation, any versions containing only some or none of the Integration) after the initial telecast of any such Program; provided, however, that no additional fee beyond the amount set forth in paragraph 3 of the Agreement shall be payable by Sponsor with respect to any exhibition of any Program that is made after the initial telecast. Nothing in the Agreement shall obligate the Network to exhibit, or obligate Producer or NBC to cause to be exhibited, any Program or any part thereof, or to otherwise use or exploit any Program or any part thereof, or subject only to Producer's refund obligations (as applicable) set forth in paragraph 3(a) of the Agreement, to exhibit or otherwise use or exploit the footage of the Integration and/or any Sponsor Materials (as defined below) and any decision to do so is in the sole and exclusive discretion of Producer and NBC (as applicable).

2. OWNERSHIP Sponsor shall not have, and shall not claim, any interest in any Pageant and any Program, and Sponsor acknowledges and agrees all right, title and interest in and to the Pageant(s) and the Program(s) and in and to any and all photographs, film and video and sound recordings and/or any other material made or taken by or for Producer or NBC pursuant to the Agreement (including, without limitation, all rights under copyright) (the "Program Materials") are the sole and exclusive property of Producer and/or NBC (as applicable). Without in any way limiting the foregoing, Sponsor acknowledges and agrees that Producer and NBC shall have the right to use, telecast and otherwise exploit, and to license, assign and otherwise transfer to third parties the right to use, telecast and otherwise exploit, any and all Program Materials (including, without limitation, in and in connection with advertisements, promotions, publicity, clips, merchandising, etc.) throughout the universe in any and all media now known or hereafter devised in perpetuity, and Sponsor shall have no claim or action against Producer or any other party arising out of any use of the Program Materials. The breach, revocation, voiding or cancellation of the Agreement shall not affect Producer's or NBC's rights under this paragraph with respect to the Pageant(s), the Program(s) or the Program Materials. Sponsor agrees that it will not make any commercial or any other use of the Integration or any other material owned or controlled by Producer or NBC, except as otherwise expressly set forth in the Agreement or pre-approved in writing by Producer and NBC. If, pursuant to the terms of the Agreement, Sponsor creates material for and/or provides material, products and/or services to Producer or NBC and/or requests that any material, products and/or services be integrated into the Program(s) (or if, pursuant to this Agreement, rights in and to material previously created by or for Sponsor are to be transferred or otherwise conveyed to Producer or NBC), then all such material (collectively, "Sponsor Materials") shall conform to the programming and operating policies of the Network. Producer shall have the right to require Sponsor to edit and modify any and all Sponsor Materials to the extent the Network deems necessary to conform to the public interest and to the standards, programming and operating policies of the Network. Sponsor hereby assigns to Producer and Producer's successors, licensees and assigns all results and proceeds of all on-screen services rendered for or on behalf of Sponsor in any Program containing the Integration.

3. INTELLECTUAL PROPERTY

(a) Sponsor acknowledges that Producer is the owner of the following trademarks, logos, trade names and service marks: MISS USA; MISS UNIVERSE; MISS TEEN USA; "Woman with Stars" logo; MISS USA crown design; MISS UNIVERSE crown design; and MISS TEEN USA crown design (collectively the "Producer Marks") and all goodwill associated therewith and has certain merchandising and other rights in and to the Producer Marks. Sponsor shall have no right to utilize any Producer Marks, except as otherwise expressly set forth in the Agreement or pre-approved by Producer in writing.

(b) Sponsor agrees that it will do nothing inconsistent with Producer's ownership of the Producer Marks and that it will not apply for registration, seek to obtain ownership, or contest or challenge Producer's ownership of the Producer Marks or any similar, related or derivate right, in any state or nation. Producer retains all rights to the Producer Marks except for the limited license, if any, expressly granted to Sponsor in the Agreement. All uses of the Producer Marks by Sponsor shall at all times inure to the benefit of Producer. Sponsor's right, if any, to use the Producer Marks shall be subject to Producer's then current quality control standards.

(c) Sponsor hereby grants to Producer and NBC a non-exclusive license to reproduce, distribute, perform, transmit and otherwise use Sponsor's trademarks, logos, symbols, trade names, service marks, copyrights and other proprietary trade designations protected by law (collectively, the "Sponsor Marks") and the Sponsor Materials, subject to the terms hereof and in and in connection with the Pageant(s), the Integration and any Program as it may be exhibited, advertised, promoted and otherwise exploited in all media now known or hereafter devised throughout the universe in perpetuity. Without limiting the foregoing, Sponsor acknowledges and agrees that Producer and NBC shall have the right to use the Sponsor Marks and the Sponsor Materials in any material created or caused to be created by or for Producer and/or NBC hereunder for use in or in connection with any Program (including, without limitation, in or in connection with advertisements, promotions, publicity, clips, merchandising, etc.) as it may be exhibited, advertised, promoted and otherwise exploited in any and all media now known or hereafter devised throughout the universe in perpetuity.

4. CONFIDENTIALITY; PUBLICITY

(a) Sponsor agrees to keep highly confidential the terms of the Agreement and any and all information learned by Sponsor in connection with the Agreement, including, without limitation, any and all information regarding any Pageant, any Program and any information about Producer, NBC, the Network and/or any Program cast members, crew, or scripts (collectively, "Confidential Information") and shall use the same care in protecting such information as is afforded Sponsor's other confidential information, but no less than reasonable care. Sponsor shall not disclose any of Producer's and/or NBC's Confidential Information to any third party without the express prior written consent of Producer and NBC. This paragraph shall be inoperative as to particular portions of the Confidential

1

Information disclosed to Sponsor if such information (i) is or becomes generally available to the public other than as a result of a disclosure by Sponsor, its Affiliates (as defined below) or its representatives, (ii) was available to Sponsor, its Affiliates or its representatives on a non-confidential basis prior to its disclosure to Sponsor by Producer or NBC, (iii) is or becomes available to Sponsor or its Affiliates or representatives on a non-confidential basis from a source other than Producer or NBC when such source is entitled, to the best of Sponsor's knowledge, to make the disclosure, or (iv) was independently developed by Sponsor, its Affiliates, or its Representatives without reference to such Confidential Information. Notwithstanding the foregoing, Sponsor may divulge the business and financial terms of this Agreement to its Affiliates, employees, and financial and legal advisors on a need to know basis. Furthermore, nothing herein shall prevent Sponsor from disclosing any information required by law.

(b) As between Producer and Sponsor, any publicity, paid advertisements, press notices or other material information with respect to this Agreement, any Pageant and any Program shall be under the sole control of Producer. Therefore, Sponsor shall not personally release, nor consent to or authorize any person or entity to release, such information without the express prior written approval of Producer. Sponsor is not guaranteed any right hereunder to view the Integration prior to its exhibition by the Network.

(c) An "Affiliate" of any party hereto means any entity directly or indirectly controlled by, controlling or under common control with such party.

5. SPONSOR'S WARRANTIES Sponsor represents and warrants that:

(a) Sponsor has the sole right and authority to enter into and fully perform this Agreement and to grant all of the rights granted by Sponsor hereunder;

(b) Sponsor has obtained all necessary rights from third parties who hold any right in any element of the Sponsor Materials to enable Producer and NBC to use such Sponsor Materials as contemplated hereunder ("Third Party Rights"), and the license granted to Producer and NBC in Paragraph 3(c) above includes such Third Party Rights.

(c) Sponsor is and will remain free to fulfill its obligations under this Agreement and there exists no other agreement or understanding that conflicts or interferes with or makes impossible the performance of its obligations hereunder;

(d) With regard to all Sponsor Materials, [i] the Sponsor Materials are Sponsor's sole creation (except as otherwise set forth expressly in the Agreement and except for material in the public domain), and nothing contained therein infringes or violates the rights of any third party; [ii] Sponsor owns and/or otherwise controls all rights in and to the Sponsor Materials that Sponsor is to deliver to Producer or NBC (except for material in the public domain); [iii] Sponsor has not granted or otherwise conveyed and will not grant or convey any right or interest that Sponsor has in or to the Sponsor Materials that would interfere with the rights granted to Producer or NBC hereunder; and [iv] to the best of Sponsor's knowledge (including that which Sponsor should have known in the exercise of reasonable prudence), there are no adverse claims, pending litigation, or threat of litigation against Sponsor involving the Sponsor Materials;

(e) With respect to any products furnished and/or provided by Sponsor to Producer or NBC, all such products will be free from defects, will function properly when used for their intended purpose, will perform in accordance with manufacturer's standard warranties, and will comply with all applicable federal, state and local laws, rules, regulations, codes and ordinances;

(f) With respect to any services to be performed by Sponsor under the Agreement, [i] all such services will be performed in a professional, timely and competent manner, in accordance with all applicable federal, state and local laws, rules, regulations, codes, ordinances, licensing requirements and union requirements, including, without limitation, all environmental and health and safety laws, rules, regulations, codes, ordinances, orders and requirements; [ii] all employees provided by Sponsor to perform services hereunder will be fully qualified, experienced and trained to perform the services required under this Agreement and will have all necessary safety training; [iii] Sponsor shall have a valid, binding and subsisting written agreement with all employees who provide on-screen services for or on behalf of Sponsor in any Program in connection with the Integration pursuant to which Sponsor is the employer of such employee and all the results and proceeds of such employee's services which are or will be required in connection with any on-screen services rendered in connection with the Agreement are work-for-hire owned exclusively by Sponsor; [iv] all services will be performed in accordance with Producer's specifications and requirements; [v] all employees provided by Sponsor hereunder will comply with all rules and regulations of Producer; and [vi] Sponsor shall inform and require each of its employees to abide by the confidentiality requirements set forth in these Standard Terms and Conditions; and

(g) With regard to all Locations, [i] the Locations are free from latent defects of which Sponsor is or should be aware except those of which Sponsor has notified Producer in writing and [ii] the Locations are maintained in compliance with all applicable federal, state and local laws, rules, regulations, codes and ordinances.

(h) Any advertisements, promotions, communications, messaging, publicity, sweepstakes or other materials created by, for, or at the direction of Sponsor that include any references to the Pageant(s) and/or the Program(s) shall be true and correct, be supported by adequate substantiation (that will be provided to the Network upon request) and shall comply with all applicable federal, state and local laws, rules, regulations, codes and ordinances.

6. PRODUCER'S WARRANTIES

(a) Producer has the sole right and authority to enter into and fully perform this Agreement;

(b) Producer is and will remain free to fulfill its obligations under this Agreement and there exists no other agreement or understanding that conflicts or interferes with or makes impossible the performance of its obligations hereunder; and

(c) Producer owns and/or controls all rights in the Producer Marks and the authorized use of the Producer Marks by Sponsor will not infringe upon or violate the rights of any third party.

7. INDEMNIFICATION

(a) Sponsor will defend, indemnify and hold Producer and NBC and their respective partners, parents, subsidiaries, Affiliates, assigns and licensees, and each of the foregoing entities' officers, directors, employees, representatives and agents, harmless from and against any and all third-party claims, damages, liabilities, demands, and causes of action, and any expenses associated therewith (including reasonable attorneys' fees and court costs, whether or not in connection with litigation) arising out of or resulting from [i] Sponsor's breach of, or any claim that Sponsor breached, any of its obligations, representations or warranties made in this Agreement; [ii] the negligence or willful misconduct of Sponsor and/or its agents, representatives or employees; [iii] any Sponsor Materials; and [iv] any advertisements, promotions, communications, messaging, publicity, sweepstakes or other materials created by, for, or at the direction of Sponsor that include any references to the Pageant(s) and/or the Program(s). The parties acknowledge that Producer shall control the defense of any claim brought against Producer and NBC shall control the defense of any claim brought against NBC, provided that Sponsor shall assume the defense if so requested by Producer and/or NBC (as applicable) and provided further that if such request is made, Producer and/or NBC (as applicable) shall have the right to approve the selection of legal counsel engaged for such defense (which approval shall not be unreasonably withheld) and Producer and/or NBC (as applicable) shall have the right to participate fully in the defense of the claim, demand or suits.

(b) Producer will defend, indemnify and hold Sponsor and its parents, subsidiaries, Affiliates, assigns and licensees, and each of the foregoing entities' officers, directors, employees, representatives and agents, harmless from and against any and all third-party claims, damages, liabilities, demands, and causes of action, and any expenses associated therewith, arising out of or resulting from Producer's breach of, or any claim that Producer breached, any of its obligations, representations or warranties made in this Agreement; however, Producer shall not be obligated to defend, indemnify or hold Sponsor harmless from claims, damages, liabilities, demands, and causes of action arising out of or resulting from [i] any Sponsor Materials and/or any advertisements, promotions, communications, messaging, publicity, sweepstakes or other materials created by, for, or at the direction of Sponsor that include any references to the Pageant(s) and/or the Program(s); [ii] any breach or alleged breach by Sponsor of Sponsor's obligations, representations or warranties; or [iii] the negligence or willful misconduct of Sponsor and/or its agents, representatives or employees. Producer shall control the defense of any claim for which it is the indemnitor; provided, however, that Sponsor shall have a right of consultation, at Sponsor's sole cost and expense, with respect to the selection of counsel, the defense, and any settlement negotiations, but Producer shall have sole decision-making authority over such matters and all other aspects of the case.

(c) The provisions of this paragraph shall survive the expiration or earlier termination of this Agreement. The indemnitor's obligations to indemnify the indemnitee are conditioned upon [i] the indemnitee's advising the indemnitor of the claim in a timely fashion, and [ii] the indemnitee's full cooperation in the defense of the claim or litigation. The assumption of the defense of any claim by the indemnitor shall not release the indemnitee from any claim the indemnitor may have against the indemnitee for breach of this Agreement.

8. FEDERAL COMMUNICATIONS ACT

(a) Sponsor represents and warrants that it has not given or agreed to give, and shall not give or agree to give, anything of value (except as set forth in the Agreement) to any person, corporation or other entity in consideration of entering into the Agreement or for obtaining exposure within any Program.

(b) Sponsor understands that the furnishing of any money, service or other valuable consideration to anyone for the exhibition of any matter in any Program (including, without limitation, any consideration furnished to Sponsor in exchange for Sponsor furnishing any valuable consideration to anyone for the telecast of any matter in any Program) without disclosing the same to the Network prior to exhibition may constitute a violation of Network policy. With respect to any Sponsor Materials, Sponsor understands that it may be a federal offense for Sponsor not to inform Producer before the exhibition of any Program that Sponsor has (a) taken or agreed to take anything of value to promote a product, service or business in any Program; or (b) used any material in connection with the products and/or services to be provided by Sponsor hereunder in connection with the Integration that would promote any product, service or business if Sponsor knows the person and/or entity providing such material to Sponsor gave Sponsor something of value for the promotion.

(c) It is also agreed that Network policy may require that a video disclaimer be telecast in the credits of any Program disclosing receipt of the production assistance in connection with the Agreement, and that such disclosures may relate to entities other than Sponsor. The exact language, placement and duration of any disclaimer will be determined by Producer and NBC in their sole discretion.

9. TERMINATION

(a) Without waiving any rights to damages or other relief that Producer may be entitled to, if Sponsor at any time (i) breaches any material provision of this Agreement, (ii) is unable, fails, neglects or refuses to perform any of its material obligations under this Agreement, or (iii) commits an act of moral outrage or is otherwise brought into public disrepute, then Producer shall have the right to terminate the Agreement if Sponsor fails to cure such breach or non-performance (to the extent that such breach or non-performance is curable) twenty (20) days (ten [10] days in the case of failure to pay) after Producer has provided Sponsor with written notice of such breach or non-performance. In the event Producer provides written notice of such breach or non-performance, Producer shall have the right to suspend performance of the Sponsorship Rights for the notice period unless and until the breach or non-performance is cured. In addition, and without waiving any rights to damages or other relief that Producer may be entitled to, if Sponsor enters into any arrangement of composition with its creditors, or if a proceeding in bankruptcy, receivership, or insolvency is instituted by or against Sponsor or its property (a "Sponsor Bankruptcy Event"), or if the condition of the affairs of Sponsor shall, in the reasonable opinion of Producer, so change as to impair Sponsor's ability to perform one or more of its obligations under this Agreement, then Producer shall have the right to terminate the Agreement immediately upon notice to Sponsor. Furthermore, any default or breach by Sponsor of, and/or grounds for termination under, any other agreement between Sponsor on the one hand, and Producer or any Affiliate of Producer on the other hand, will be a default, breach and/or ground for termination under this Agreement,

and any default or breach by Sponsor of, and/or grounds for termination under, the Agreement will be a default, breach and/or grounds for termination under any and all other agreements between Producer or any Affiliate of Producer on the one hand, and Sponsor on the other hand. In the event that Producer elects to terminate the Agreement pursuant to this paragraph 9, Producer shall have no further obligation to Sponsor, except that if such election is based on a Sponsor Bankruptcy Event, Producer shall reimburse Sponsor for any cash fee paid to Producer by Sponsor in connection with the Sponsorship Rights for which Sponsor has not and will not receive equitable consideration in return, less the costs and expenses incurred by Producer as a direct result of the termination of the Agreement.

(b) Without waiving any rights to damages or other relief that Sponsor may be entitled to, if Producer at any time (i) breaches any material provision of this Agreement, or (ii) is unable, fails, neglects or refuses to perform any of its material obligations under this Agreement, then Sponsor shall have the right to terminate the Agreement if Producer fails to cure such breach or non-performance (to the extent that such breach or non-performance is curable) within twenty (20) days after Sponsor has provided Producer with written notice of such breach or non-performance. In addition, and without waiving any rights to damages or other relief that Sponsor may be entitled to, if Producer enters into any arrangement of composition with its creditors, or if a proceeding in bankruptcy, receivership, or insolvency is instituted by or against Producer or its property (a "Producer Bankruptcy Event"), or if the condition of the affairs of Producer shall, in the reasonable opinion of Sponsor, so change as to impair Producer's ability to perform one or more of its obligations under this Agreement, then Sponsor shall have the right to terminate the Agreement immediately upon notice to Producer. In the event that Sponsor elects to terminate the Agreement pursuant to this paragraph 9, Sponsor shall have no further obligation to Producer, except that if such election is based on a Producer Bankruptcy Event, Sponsor shall pay Producer any cash fee in connection with the Sponsorship Rights for which Sponsor has and will receive equitable consideration in return, less the costs and expenses incurred by Sponsor as a direct result of the termination of the Agreement.

10. FORCE MAJEURE Neither party shall be liable for failure to perform or delay in performing any obligation under the Agreement if such failure or delay is due to fire or flood or hurricane or earthquake or similar act of God, lockout or strike or other labor dispute, war (declared or undeclared), embargo, epidemic, disease, substantial interruption in, or substantial delay or failure of, technical facilities, accident, damage, destruction or any other cause beyond the control of such party ("Force Majeure Event"). Either party may terminate the Agreement, without liability to the other party, if the Force Majeure Event continues for such time as to defeat the purpose of the Agreement, and the parties will negotiate in good-faith the pro-rata portion of the Cash Fee that will be refunded to Sponsor.

11. NOTICE; COMPUTATION OF TIME PERIOD; MANNER OF DELIVERY Any notice, communication, consent, approval or disapproval and request therefore required or permitted to be sent hereunder shall be made in writing and sent by personal delivery or by certified mail (return receipt requested, postage prepaid), Federal Express, or fax, at the respective addresses given above (or such other addresses as are given in writing in accordance with this provision). Notice shall be deemed given on the date personally delivered or delivery by facsimile or Federal Express to such party or three (3) days following its deposit in the United States mail. All notices from Producer must be given by the Producer Business & Legal Affairs Department. Whenever the last day on which a notice can be given falls on a weekend or holiday observed by Producer, such notice may be validly given on the next day (that is not on a weekend or holiday) following the weekend or holiday. Notwithstanding the foregoing, with respect to any provision in the Agreement that requires Producer's approval or consent, at Producer's option, Producer may communicate its decision to Sponsor by e-mail (and such decision need not be communicated by the Producer Business & Legal Affairs Department). Either party may, in writing, on ten (10) days notice, inform the other party of a new or changed address or addressee to which notices under the Agreement should be sent.

12. APPLICABLE LAW, FORUM AND REMEDIES

(a) The Agreement shall be construed and enforced in accordance with the internal, substantive law of the State of New York, applicable to contracts negotiated, executed, and fully performed within that State, regardless of where performance of the Agreement may actually occur and without regard to the conflict of laws principles thereof.

(b) All parties consent to the sole and exclusive personal jurisdiction and venue in the federal and state courts in the City and County of New York, New York, and agree that all litigation regarding the Agreement, any breach of the Agreement, the relations of the parties and any and all disputes between the parties shall be submitted to and determined by said courts, which shall have sole and exclusive jurisdiction.

(c) Sponsor agrees that given the nature of the entertainment industry, and the irreparable damage to Producer that would result from delaying or preventing the exhibition or distribution of any Program, Sponsor's rights and remedies in the event of a breach or alleged breach of the Agreement by Producer shall be limited to Sponsor's right, if any, to recover damages in an action of law, and in no event shall Sponsor be entitled by reason of any breach or alleged breach to injunctive or other emergency or equitable relief that prohibits or prevents Producer or NBC from distributing, exhibiting, or licensing the right to exhibit or distribute, any Program produced hereunder, or otherwise preventing any licensee from exhibiting or distributing any such Program.

13. LIMITATIONS ON LIABILITY The parties waive the right to seek punitive or exemplary damages and in no event shall either party be liable for such damages.

14. NO RELATIONSHIP; ASSIGNMENT Producer and Sponsor are independent contractors, and the Agreement is not intended to and shall not be construed to create a joint venture or partnership between said parties or constitute either of them as agents of the other. Sponsor shall not assign, subcontract, encumber, or otherwise transfer voluntarily, involuntarily or by operation of law the Agreement or any of Sponsor's rights or obligations under the Agreement without the prior written consent of Producer, which consent Producer may grant or withhold in its sole discretion.

15. ENTIRE AGREEMENT This Agreement constitutes the entire agreement between Producer and Sponsor with respect to the subject matter hereof, all

previous understandings whether oral or written having been merged herein. No representations or warranties have been made other than those expressly set forth herein. This Agreement may not be changed, modified, renewed, extended, or discharged or any covenant or provision hereof waived except by an agreement in writing signed by the party against whom enforcement of the change, modification, renewal, extension, discharge or waiver is sought.

16. CONSTRUCTION The captions of this Agreement are inserted solely for convenience and shall not affect the meaning or construction of any of the terms, provisions, covenants and conditions of this Agreement. The language of this Agreement will in all cases be construed simply according to its fair and plain meaning and not strictly for or against either party.

17. SEVERABILITY If any provision, sentence or clause of this Agreement is held to be indefinite, invalid, or otherwise unenforceable, the balance of the Agreement will continue unimpaired and in full force and effect; provided, however, that the aggregate of all such provisions found to be invalid or unenforceable does not materially affect the benefits and obligations of the parties to this Agreement as a whole.

18. WAIVER No waiver by either party of any covenant or provision of this Agreement shall be deemed a waiver of any preceding or succeeding breach of the same, or any other, covenant or provision.

19. COUNTERPARTS This Agreement may be signed in multiple counterparts, each of which shall be deemed an original instrument and all of the counterparts together will constitute one and the same instrument. Facsimile signatures shall be as binding and conclusive as if they were original signatures.